1  **PROSPER LAW GROUP, LLP**
2  Gordon F. Dickson, Esq., SBN 136857
   Deborah P. Gutierrez, Esq., SBN 240383
3  Michael E. Thompson, Esq., SBN 266275
   6100 Center Drive, Suite 1050
4  Los Angeles, California 90045
   Telephone:  (310) 893-6200
5  Facsimile:   (310) 988-2930
   Email:       deborah@prosperlaw.com
6
7  Attorneys for Plaintiffs,
   Ronal Vargas and Maria Vargas
8

FILED
2011 NOV 14 PM 3:13
CLERK U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIF.
LOS ANGELES
BY _____

9

10              **UNITED STATES DISTRICT COURT**

11              **CENTRAL DISTRICT OF CALIFORNIA**

12

13  RONAL VARGAS, an individual, and      **Case No. CV11-08002 RSWL (JCGx)**
    MARIA VARGAS, an individual,
14                                        **FIRST AMENDED COMPLAINT**
                                          **FOR:**
15              Plaintiffs,

16              vs.                        1.  **DECLARATORY RELIEF**
                                              **[28 U.S.C. §§ 2201, 2202]**
17  BRIDGEFIELD MORTGAGE              2.  **NEGLIGENCE**
    CORPORATION F/K/A RESMAE          3.  **QUASI CONTRACT**
18  MORTGAGE CORPORATION; HSBC        4.  **VIOLATION OF 15 U.S.C.**
    BANK USA, NATIONAL                    **§ 1692e**
19  ASSOCIATION AS TRUSTEE UNDER      5.  **VIOLATION OF 15 U.S.C.**
    NOMURA HOME EQUITY, INC.              **§ 1641(g)**
20  ASSET-BACKED CERTIFICATES,        6.  **VIOLATION OF 12 U.S.C.**
    SERIES 2007-3; LITTON LOAN            **§ 2605**
21  SERVICING, LP; OCWEN LOAN         7.  **VIOLATION OF**
    SERVICNG, LLC; and Does 1 – 10,       **CALIFORNIA BUSINESS**
22  inclusive,                            **AND PROFESSIONS CODE**
                                          **SECTION 17200, ET SEQ.**
23                                     8.  **ACCOUNTING**
                                       9.  **QUIET TITLE**
24                                     10. **BREACH OF CONTRACT**
                                       11. **BREACH OF THE IMPLIED**
25              Defendants.               **COVENANT OF GOOD**
                                          **FAITH AND FAIR DEALING**
26

27                                     **DEMAND FOR JURY TRIAL**

28

1

<u>**TABLE OF CONTENTS**</u>

2   **I.**   STATEMENT OF THE CASE.................................................................3

3   **II.**   JURISDICTION, VENUE, AND PARTIES.........................................4

4   **III.**   FACTUAL ALLEGATIONS..............................................................6

5   **IV.**   FIRST CAUSE OF ACTION – DECLARATORY RELIEF: TO DETERMINE STATUS OF

6   DEFENDANTS' CLAIMS [28 U.S.C. §§ 2201, 2202]...............................12

7   **V.**   SECOND CAUSE OF ACTION – NEGLIGENCE.........................................14

8   **VI.**   THIRD CAUSE OF ACTION – QUASI CONTRACT.......................................15

9   **VII.**   FOURTH CAUSE OF ACTION – VIOLATION OF 15 U.S.C. § 1692e...........……..16

10   **VIII.** FIFTH CAUSE OF ACTION – VIOLATION OF 15 U.S.C. § 1641(g)...........................19

11   **IX.**   SIXTH CAUSE OF ACTION –  VIOLATION OF 12 U.S.C. § 2605………….....................23

12   **X.**   SEVENTH CAUSE OF ACTION – BUS. AND PROF. CODE SECTION 17200, ET SEQ......25

13   **XI.**   EIGHTH CAUSE OF ACTION – ACCOUNTING...........................................29

14   **XII.**   NINTH CAUSE OF ACTION – QUIET TITLE.............................................30

15   **XIII.** TENTH CAUSE OF ACTION – BREACH OF CONTRACT.................................31

16   **XIV.**   ELEVENTH CAUSE OF ACTION – BREACH OF THE IMPLIED COVENANT OF GOOD

17   FAITH AND FAIR DEALING...........................................................33

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT**

COME NOW Plaintiffs Ronal Vargas and Maria Vargas ("Plaintiffs" or "Mr. Vargas and Mrs. Vargas"), by and through their counsel, for their Complaint against Defendants Bridgefield Mortgage Corporation F/K/A Resmae Mortgage Corporation (in its capacity as origination lender) (hereinafter "**Resmae**"); HSBC Bank USA, National Association as Trustee Under Nomura Home Equity, Inc., Asset-Backed Certificates, Series 2007-3, (in its capacity as purported beneficiary of Plaintiffs' Deed of Trust) (hereinafter "**HSBC Bank**"); Litton Loan Servicing, LP, (in its capacity as purported mortgage servicer) (hereinafter "**Litton**"), Ocwen Loan Servicing, LLC (in its capacity as purported mortgage servicer as of September 1, 2011) (hereinafter "**Ocwen**") (collectively "Defendants"), plead as follows:

## I.   STATEMENT OF THE CASE

1.      On September 20, 2006, Plaintiffs executed a promissory note ("Note") in favor of Resmae, in the amount of $480,000 secured by a deed of trust ("Deed of Trust" or "Mortgage") for the finance of real property located at 822 Auburn Avenue, Chula Vista, California 91913.  Subsequently, Defendants' failure to assign or transfer Plaintiffs' Note to HSBC Bank resulted in Defendants' inability to collect on the Note and enforce the Deed of Trust.  Despite Defendants' failure to perfect a security interest, HSBC Bank and its agents have attempted to collect on this Note and enforce the Deed of Trust with the knowledge that they have no legal right to do so.  In addition to violating the Fair Debt Collection Practices, the Truth in Lending Act, and the Real Estate Settlement Procedures Act, Defendants further their fraudulent scheme and create the air of propriety surrounding their debt collection efforts by misrepresenting to Plaintiffs' and *to the Court* that they have authority to collect Plaintiffs' obligation and that they have the right to take Plaintiffs' property away.  Through this action, Plaintiffs seek damages resulting from Defendants' unlawful conduct and a declaratory judgment establishing that Defendants have failed to substantiate a perfected security interest in

the Note and Deed of Trust (collectively referred to as "Loan").  Simply put, Defendants have no legal, equitable, or pecuniary interest in the Note and Deed of Trust.

2.      In the alternative, if the Court finds that any of the Defendants have an enforceable security interest in either the Note or Deed of Trust, Plaintiffs maintain that Defendants have breached Section 2 of the Deed of Trust and the Implied Covenant of Good Faith and Fair Dealing, by charging improper fees and miscalculating and misapplying payments to offset both principal and interest, in addition to the statutory provisions listed above.

## II.     JURISDICTION, VENUE, AND PARTIES

3.      This Court has original jurisdiction over the claims in this action based on 28 U.S.C. §§ 1331, 1343, 2201, 2202, 15 U.S.C. § 1641(g), 15 U.S.C. § 1692e, 12 U.S.C. § 2605, and 42 U.S.C. § 1983 which confer original jurisdiction on federal district courts in suits to address the deprivation of rights secured by federal law.

4.      This Court also has supplemental jurisdiction over the pendant state law claims because they form a part of the same case or controversy under Article III of the United States Constitution, pursuant to 28 U.S.C. § 1367.

5.      This Court has original jurisdiction over the claims in this action based on 28 U.S.C. § 1332 which confers original jurisdiction on federal district courts in suits between diverse citizens that involve an amount in controversy in excess of $75,000.00.

6.      The unlawful conduct, illegal practices, and acts complained of and alleged in this Complaint were all committed in the Southern District of California and involved real property that is located in the Southern District of California.  Therefore, venue properly lies in this District, pursuant to 28 U.S.C. § 1391(b).

7.      Plaintiffs are now, and at all times mentioned herein, individuals residing in the County of San Diego, in the State of California.  At all times relevant to this action, Plaintiffs have owned real property commonly known as 822 Auburn Avenue, Chula Vista, California 91913 (the "Property").  Further described as Assessor's Parcel Number 642-200-28, with the following legal description:

Lot 25 of Southwestern College Estates Unit no. 3, in the City of Chula Vista, County of San Diego, State of California, according to map thereof no. 6247, filed in the Office of the County Recorder of San Diego County, December 10, 1968.

Excepting therefrom all the minerals, coals, oils, petroleum, gas and kindred substances under and in said land, but without right of entry of the surface thereof, but with the right however to drill in, through or under said land or to explore, develop and take all minerals, coals, oils, petroleum, gas and other kindred substances in and from said land, all such operations to be conducted below a depth of 500.00 feet below the surface thereof. Also excepting therefrom adjacent dedicated streets.

8.     At all relevant times, Bridgefield Mortgage Corporation F/K/A Resmae Mortgage Corporation is a Delaware corporation with its principal place of business in Delaware.

9.     At all relevant times, HSBC Bank USA, National Association as Trustee Under Nomura Home Equity, Inc., Asset-Backed Certificates, Series 2007-3, is a National Association organized under the laws of the United States with its main office in New York.

10.     At all relevant times, Litton Loan Servicing, LP is a Delaware limited partnership. The general partner is Litton GP LLC, a Texas limited liability company, and the limited partner is Credit Based Asset Servicing and Securitization, LLC, a Delaware limited liability company.

11.     At all relevant times Ocwen Loan Servicing, LLC, is a limited liability company with its sole member, Ocwen Financial Corporation, a corporation organized under the laws of Florida and headquartered in Florida. Ocwen therefore is a citizen of Florida.

12.     Plaintiffs are ignorant of the true identity and capacity of Defendants designated as Does 1 - 10, but will amend the Complaint when their identities have been ascertained according to proof within the time permitted. However, Plaintiffs allege on information and belief, that each and every Doe Defendant is in some manner responsible for the acts and conduct of the other Defendants, and were, and are,

responsible for the injuries, damages, and harm incurred by Plaintiffs. Plaintiffs further allege on information and belief that each such designated Defendant acted, and acts, as the authorized agent, representative, and associate of the other Defendants in doing the things alleged herein.

13.     Whenever reference is made in this Complaint to any act of any Defendant(s), that allegation shall mean that each Defendant acted individually and jointly with the other Defendants.

14.     Any allegation about acts of any corporate or other business Defendant(s) means that the corporation or other business did the acts alleged through its officers, directors, employees, agents and/or representatives while they were acting within the actual or ostensible scope of their authority.

15.     At all relevant times, each Defendant committed the acts, caused or directed others to commit the acts, or permitted others to commit the acts alleged in this Complaint. Additionally, some or all of the Defendants acted as the agent of the other Defendants, and all of the Defendants acted within the scope of their agency if acting as an agent of the other.

16.     At all relevant times, each Defendant knew or realized that the other Defendants were engaging in or planned to engage in the violations of law alleged in this Complaint. Knowing or realizing that the other Defendants were engaging in or planning to engage in unlawful conduct, each Defendant nevertheless facilitated the commission of those unlawful acts. Each Defendant intended to and did encourage, facilitate, or assist in the commission of the unlawful acts, and thereby aided and abetted the other Defendants in the unlawful conduct.

## III.   FACTUAL ALLEGATIONS

17.     On or about September 20, 2006, Ronal Vargas and Maria Vargas executed a Note and Deed of Trust in favor of Resmae obtaining a Loan secured by the Subject Property.

18.     On information and belief, Plaintiffs allege that shortly after the origination of their Loan, Resmae sold their Loan to another entity or entities.  Those entities are currently unknown but will be identified through discovery.

19.     Plaintiffs allege that these unknown entities and Defendants were involved in an attempt to securitize their Loan into the Nomura Home Equity, Inc., Asset-Backed Certificates, Series 2007-3 ("Nomura Trust").  *See* **Exhibit "A",** attached hereto is a securitization flow chart depicting the securitization process.  In order for Plaintiffs' Mortgage to be a part of the Nomura Trust, the entities involved were required to follow various agreements and established laws, including the Trust Agreement that governed the creation of the Trust.  Plaintiffs allege the entities involved in the attempted securitization of Plaintiffs' Loan failed to adhere to the requirements of the Trust Agreement necessary to properly assign the mortgage loan into the Trust.  As a result, Plaintiffs' Loan was not assigned to the Nomura Trust and is therefore not part of the Trust res.  This fatal defect renders Defendants third-party strangers to the underlying debt obligation without the power or right to demand payment, declare default, negotiate their Loan, and foreclose on their Property.  Although Defendants are aware of this fact, they have and continue to act as if they have authority to demand payment, declare default, negotiate their Loan, and foreclose on their Property.  Plaintiffs specifically dispute these facts.

20.     On or around March 2009, Mr. Vargas and Mrs. Vargas experienced unforeseen financial hardship.  They initiated loan modification negotiations with Litton, in an attempt to work out an affordable payment.  Plaintiffs believed Litton would be willing to negotiate with them because they claimed they were happy to assist homeowners in negotiating loan modifications.  Shortly thereafter, Plaintiffs contacted Litton a couple times each week for an update on the status of their loan modification and were told each time it was under review.  After three months, Litton offered Mr. Vargas and Mrs. Vargas a trial plan effective July 1, 2009.

21.   Mr. and Mrs. Vargas paid their first trial plan payment on or around July 1, 2009 but just one month later when Mr. and Mrs. Vargas attempted to pay their second trial plan payment, Litton rejected and returned their payment.

22.   Plaintiffs were extremely concerned because they were never given an explanation why their payment was rejected and felt they were missing out on an opportunity to save their home as a result of a fixable error.  Plaintiffs attempted to contact Litton several times but each time they were connected to an automated service. Finally, on or around October 21, 2009, Plaintiffs were able to contact an agent at Litton who informed Mr. and Mrs. Vargas their trial plan was cancelled because their loan modification packet required more documents.  Plaintiffs were confused by this explanation because they had submitted all the requested documentation and overall they were frustrated with Litton's failure to contact them before cancelling their trial plan.  A few days later, Litton told Plaintiffs that they were willing to re-open the cancelled trial plan.

23.   On or around October 27, 2009, Plaintiffs resubmitted a complete loan modification packet.  Again, Plaintiffs contacted Litton every week to get a status update.  A month later, Plaintiffs were told that their trial plan was still in the process of being re-opened.

24.   Finally, on or around December 10, 2009, Mr. and Mrs. Vargas' loan modification packet was re-approved, effective January 1, 2010.  Mr. and Mrs. Vargas paid the modified payment for about five months.  After collecting the modified payments Litton denied the loan modification.

25.   Over the course of two years, Mr. Vargas and Mrs. Vargas attempted to obtain some type of assistance in modifying their mortgage payment.  Although Litton appeared eager to help, it was clear that they were only strining them along with no real interest in modifying their payments.

26.   After years of negotiation, follow up phone calls, and resubmitting documents many times over, Mr. Vargas and Mrs. Vargas felt they had been treated

1    unfairly and sought counsel to investigate if Litton had the authority to negotiate their

2    Loan.  Plaintiffs soon learned that none of the Defendants have any legal or corporate

3    authority to collect on their Loan, service the Loan, or proceed with a lawful foreclosure.

4         27.    Plaintiffs' investigation has confirmed that there was an **attempt** to

5    securitize the Mortgage by assigning and transferring the Mortgage into the Nomura

6    Trust, but the mortgage loan was never actually assigned and transferred to the Nomura

7    Trust.

8         28.    In fact, Plaintiffs allege that the Mortgage was never assigned or

9    transferred, to any of the parties involved in the securitization process.  Specifically,

10   Plaintiffs allege that their Note and Mortgage were never assigned to the Sponsor,

11   Depositor, the Nomura Trust, or any of the Defendants as required by the Trust

12   Agreement (a.k.a. the Pooling and Servicing Agreement).

13        29.    Plaintiffs allege that the Mortgage was not properly assigned to the Nomura

14   Trust on or before July 10, 2007, the required "Closing Date," as set forth in the Trust

15   Agreement.  The "Closing Date" is the date by which all of the notes and mortgages

16   must be transferred into the Nomura Trust in order for the mortgage loan to be a part of

17   the trust res.  As such, Mr. Vargas and Mrs. Vargas's Loan was never, and has never

18   been, part of the Nomura Trust res.

19        30.    In further violation of Section 2.01 of the Trust agreement, Defendants

20   failed to deposit specific documents, such as all endorsed promissory notes, the original

21   recorded mortgage, and an assignment to the Trustee with the Custodian of Records of

22   the Nomura Trust.  These documents were required to be deposited in order to complete

23   the assignment and transfer of Plaintiffs' Note and Mortgage to the Trust.

24        31.    Despite this failure to assign, transfer, and grant Plaintiffs' Mortgage to

25   HSBC Bank, Defendants have made numerous attempts to collect on Plaintiffs'

26   mortgage and cannot cover-up this fatal defect unless they fabricate an Assignment of

27   Deed of Trust ("Assignment") that purportedly was executed before the Closing Date of

28   the Trust.

32.     On or around March 28, 2011, after the initial investigation, Plaintiffs sent a Qualified Written Request to Litton in order to verify and validate their debt, pursuant to Real Estate Settlement Procedures Act, 12 U.S.C. § 2605(e) in which they requested documentation demonstrating who actually owned their Note. Plaintiffs' QWR requested that the servicer provide, among other things, the name, address, name of a contact person and telephone number of the owner of their mortgage Note. *See* **Exhibit "B,"** attached hereto is a true and correct copy of Plaintiffs' Qualified Written Request. The Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act")[1] requires that the servicer provide an acknowledgement of receipt of the QWR within five days of receipt and to substantively respond within thirty business days of receipt.  In violation of the Dodd-Frank Act, Litton did not acknowledge or further respond to Plaintiffs' QWR.

33.     Plaintiffs do not dispute that they owe money on their mortgage obligation. Rather, Plaintiffs dispute the amount owed and seeks the Court's assistance in identifying the true creditor entitled to payment.

34.     Plaintiffs' information and belief is based on (1) a title report and analysis of the Property's county records; (2) direct written and oral communication with Defendants; (3) their counsel's research, experience, and extensive review of depositions, case law, amicus briefs, correspondence, news articles, reports, complaints by Attorneys General from various states, and publicly available securitization documents and practices; and (4) an audit of HSBC Bank's filings with the Securities

---

[1] The Dodd-Frank Act was signed into law on July 21, 2010.  The Act amended several statutes including 12 U.S.C. § 2605.  The Act amended 12 U.S.C. § 2605 by shortening the deadline to acknowledge a QWR from fifteen days to only five days and shortening the substantive response deadline from sixty days to thirty days.  There is a fifteen day extension allowed if the borrower is notified of the extension and the reasons for the delay.  In addition, the Dodd-Frank Act requires a servicer of a federally related mortgage to "respond to a QWR within 10 business days to a request from a borrower to provide the identity, address, and other relevant contact information about the owner or assignee of the loan." H.R. 4173 section 1463(a).  The Dodd-Frank Act provides available damages to an individual for failing to respond to a QWR request.  Available damages were increased from actual damages plus $1,000.00 to actual damages plus $2000.00.  The Dodd-Frank Act also prohibits various servicing practices and made a few changes to TILA.

and Exchange Commission ("SEC"), including HSBC Bank's 424B5 Prospectus and Pooling and Servicing Agreement ("PSA").

35.    Plaintiffs made payments based on the allegedly improper, inaccurate, and fraudulent representations of Plaintiffs' account.

36.    Plaintiffs have been paying the wrong creditor and all payments made to the Nomura Trust must be disgorged and refunded.

37.    Plaintiffs have been damaged as their credit and credit scores were severely damaged.

38.    The title to Plaintiffs' home has been slandered, clouded, and its salability has been rendered unmarketable.

39.    Plaintiffs must seek the Court's assistance to identify their true creditor as they risk not obtaining clear title to this property should they be able to workout a payment plan or forbearance.

40.    Plaintiffs do not know who the current beneficiary of their Note and Mortgage actually is, such that they are now subject to double financial jeopardy.

41.    Plaintiffs have offered to and are ready, willing, and able to unconditionally tender their obligation.[2]

---

[2] Case law makes clear that **Plaintiffs are only required to allege a credible offer of tender**, not actually tender. *Alicia v. GE Money Bank*, No C 09-00091 SBA, 2009 WL 2136969 at *3 (N.D. Cal. July 16, 2009) ("...debtor must allege a credible tender of the amount of the secured debt..."). Moreover, tender is ***not*** required when the owner's action attacks the validity of the underlying debt because the tender would constitute an affirmation of the debt. *Sacchi v. Mortgage Electronic Registration Systems, Inc.*, No. CV 11-1658 AHM, 2011 WL 2533029 at *16 (C.D.Cal June 24, 2011) (emphasis added) citing *Onofrio v. Rice*, 55 Cal. App. 4th 413, 424 (1997); *Stockton v. Newman*, 148 Cal. App. 2d 558, 564 (1957). *See also Foulkrod v. Wells Fargo Financial California Inc.*, No. CV 11-732-GHK (AJWx) (C.D. Cal. May 31. 2011) ("...requiring plaintiff to tender the amount due on his loan at this time would be illogical and inequitable given that he disputes that Wells Fargo has any rights under the loan."). In light of the fact that Plaintiffs contest the legitimacy of the Defendants' claim to the mortgage payments, it would be ***illogical and inequitable*** to require Plaintiffs to actually tender the amount given that Plaintiffs dispute whether Defendants have any rights under the loan. *See Onofrio v. Rice*, 55 Cal. App. 4th 413, 424 (1997).

42.     Not only are Plaintiffs ready, willing, and able to tender their obligation, but they are also gainfully employed and have the ability to pay their obligation.

## FIRST CAUSE OF ACTION – DECLARATORY RELIEF: TO DETERMINE STATUS OF DEFENDANTS' CLAIMS [28 U.S.C. §§ 2201, 2202]

### [Against All Defendants and Doe Defendants]

43.     Plaintiffs hereby incorporate by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

44.     Section 2201(a) of Title 28 of the United States Code states:

> In a case of actual controversy within its jurisdiction, except with respect to Federal taxes other than actions brought under section 7428 of the Internal Revenue Code of 1986, a proceeding under section 505 or 1146 of title 11, or in any civil action involving an antidumping or countervailing duty proceeding regarding a class or kind of merchandise of a free trade area country (as defined in section 516A(f)(10) of the Tariff Act of 1930), as determined by the administering authority, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

45.     Section 2202 of Title 28 of the United States Code states:

> Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment.[3]

46.     Plaintiffs allege that HSBC Bank does not have a secured or unsecured legal, equitable, or pecuniary interest in the lien evidenced by the Deed of Trust and that its purported assignment has no value since the Deed of Trust is wholly unsecured.

47.     Defendants claimed they were assigned and transferred a secured enforceable interest in, and a perfected lien against the Plaintiffs' Note, Deed of Trust, and Property.  Plaintiffs dispute this fact.

---

[3] It is axiomatic that a cause of action for declaratory relief serves the purpose of adjudicating *future* rights and liabilities between parties. *See Cardellini v. Casey*, 181 Cal. App. 3d 389 (1986) [Emphasis added]; *Bachis v. State Farm Mutual Auto. Ins. Co.*, 265 Cal. App. 2d 722 (1968).

48.     Thus, the competing allegations made by Plaintiffs and Defendants, above, establish that a real and actual controversy exists as to the respective rights of the parties to this matter, including ownership of the Property.[4]

49.     In addition, the harm by Defendants is ongoing and includes the imminent foreclosure of Plaintiffs' home.  Therefore, as this claim relates to future harm, Plaintiffs' declaratory relief claim is cognizable as an independent cause of action.[5]

50.     Accordingly, Plaintiffs request that the Court make a finding and issue appropriate orders stating that none of the named Defendants or Doe Defendants, have any right or interest in Plaintiffs' Note, Deed of Trust, or the Property which authorizes them, in fact or as a matter of law, to collect Plaintiffs' mortgage payments or enforce the terms of the Note or Deed of Trust in any manner whatsoever.

51.     Plaintiffs will suffer prejudice if the Court does not determine the rights and obligations of the parties because: (1) Plaintiffs will be denied the opportunity to identify their true and current creditor/lender and negotiate with them; (2) they will be denied the right to conduct discovery and have HSBC Bank's, Litton's, and/or Ocwen's claims verified by a custodian of records who has personal knowledge of the Loan and all transactions related to it; and (3) they will be denied the opportunity to discover the true amount they still owe minus any illegal costs, fees, and charges.

52.     Due to the actual case and controversy regarding competing claims and allegations, it is necessary that the Court declare the actual rights and obligations of the parties and make a determination as to whether HSBC Bank's claims against Plaintiffs

---

[4] "Declaratory relief is only appropriate '(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" *Guerra v. Sutton*, 783 F.2d 1371, 1376 (9th Cir. 1986).

[5] *See Seattle Audubon Soc'y v. Moseley*, 80 F.3d 1401, 1405 (9th Cir. 1996)("A declaratory judgment offers a means by which rights and obligations may be adjudicated in cases brought by any interested party involving an actual controversy that has not reached a stage at which either party may seek a coercive remedy and in cases where a party who could sue for coercive relief has not yet done so.").

are enforceable and whether they are secured or unsecured by any right, title, or interest in Plaintiffs' Property.

53.     Furthermore, the conduct of HSBC Bank, Litton, Ocwen, and/or one or more of the Doe Defendants, and each of them, as herein described, was so malicious and contemptible that it would be looked down upon and despised by ordinary people. Plaintiffs are therefore entitled to punitive damages in an amount appropriate to punish Defendants and to deter others from engaging in similar conduct.

## SECOND CAUSE OF ACTION - NEGLIGENCE

### [Against HSBC Bank, Litton, Ocwen, and Doe Defendants]

54.     Plaintiffs hereby incorporate by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

55.     At all times relevant herein, Litton and/or Ocwen was acting as a purported agent for HSBC Bank.  HSBC Bank, Litton, and/or Ocwen formed an unconventional relationship with Plaintiffs when they chose to take part in a new era of securitization of mortgage loans.  HSBC Bank is no longer a bank simply holding the interest in Plaintiffs' Note and Mortgage but now is a trustee for a trust which holds the benefit of Plaintiffs' Note and Mortgage for the investors in the trust.

56.     HSBC Bank, Litton, and/or Ocwen, have a duty to exercise reasonable care[6] and skill to follow California law with regard to enforcement of monetary obligations, and to refrain from taking or failing to take any action against Plaintiffs that they did not have the legal authority to do.  This includes enforcing the Note and Deed of Trust by collecting or demanding mortgage payments when they do not have the right to enforce the obligation, causing the Plaintiffs to overpay in interest, making derogatory

---

[6] Normally lenders and servicers do not owe a borrower a duty of care. *Nymark v. Heart Fed. Savings & Loan Assn.*, 231 Cal. App. 3d 1089, 1093 (1991).  However, a bank may be liable in negligence if it fails to discharge its contractual duties with reasonable care.  *Das v. Bank of Am.*, 186 Cal. App. 4th 727, 741 (2010).  Additionally, a bank may be liable for aiding and abetting a tort when it renders "substantial assistance" to a tortfeasor during a business transaction that it knowingly aided in the commission of the tort. *Id.* citing *Casey v. U.S. Bank Nat. Assn.*, 127 Cal. App. 4th 1138, 1144-45).

credit reports to credit bureaus, and failing to keep an accurate accounting of Plaintiffs' mortgage payments, credits, and debits (if Litton and/or Ocwen is in fact the legally authorized mortgage servicer for Plaintiffs).

57.     HSBC Bank, Litton, and/or Ocwen have a duty to exercise reasonable care and skill to refrain from taking any action against Plaintiffs that they do not have the legal authority to do.  As a direct and proximate result of the reckless negligence, utter carelessness, and blatant fraud of the Defendants as set forth above, the chain of title to Plaintiffs' Property has been rendered unmarketable and fatally defective and has caused Plaintiffs to lose saleable title to the subject property.

58.     HSBC Bank, Litton, and/or Ocwen breached that duty when they failed to follow the guidelines established in the PSA requiring the transfer of the Note and Deed of Trust into the Nomura Trust by the Closing Date.

59.     As a direct and proximate result of the negligence and carelessness of the Defendants as set forth above, Plaintiffs suffered, and continue to suffer, general, and special damages in an amount to be determined at trial, including attorneys' fees and costs of bringing suit to dispute, validate, and challenge said Defendants' purported rights to enforce their debt obligation against them.

## THIRD CAUSE OF ACTION – QUASI CONTRACT

### [Against HSBC Bank, Litton, Ocwen, and Doe Defendants]

60.     Plaintiffs hereby incorporate by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

61.     HSBC Bank attempted but failed to become a party to the Note and Deed of Trust when it was purportedly assigned Resmae's interest in Plaintiffs' Note and Deed of Trust.  HSBC Bank, Litton, and/or Ocwen demanded monthly mortgage payments from Plaintiffs starting in September 20, 2006 and continued to collect payments from Plaintiffs for approximately six years.  Plaintiffs reasonably relied upon HSBC Bank, Litton, and/or Ocwen's assertion that they were entitled to payments.

62.     HSBC Bank, Litton, and/or Ocwen knowingly accepted payments and retained them for their own use knowing that HSBC Bank, Litton, and/or Ocwen did not acquire an interest in Plaintiffs' Note, such that they could accept or keep Plaintiffs' payments.  It would be inequitable for HSBC Bank, Litton, and/or Ocwen to retain the payments it received from Plaintiffs which they did not have legal authority to collect.  The equitable remedy of restitution when unjust enrichment has occurred is an obligation created by the law without regard to the intention of the parties, and is designed to restore the aggrieved party to his or her former position by return of the thing or its equivalent in money.

63.     Section 23 of the Deed of Trust states that: "Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee.  Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it."  The obligations to Resmae under the Deed of Trust were fulfilled when Resmae received the balance on the Note as proceeds of the sale of Plaintiffs' Note and Mortgage to a presently unknown entity.  HSBC Bank, Litton, and/or Ocwen have been unjustly enriched by collecting monthly payments from Plaintiffs when they have no interest their Note or Deed of Trust.

64.     Plaintiffs seek restitution for any payments they made to HSBC Bank, Litton, and/or Ocwen that were not paid to the lender or beneficiary, if any.

## FOURTH CAUSE OF ACTION – VIOLATION OF 15 U.S.C. § 1692e

### [Against HSBC Bank, Litton, Ocwen, and Doe Defendants]

65.     Plaintiffs hereby incorporate by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

66.     Defendant HSBC Bank, acting as the trustee of the Nomura Trust is in the business where the principal purpose is to collect debts on behalf of the investors in the Nomura Trust.  HSBC Bank attempted to collect Plaintiffs' debt obligation on behalf of

the Nomura Trust investors and thus is a debt collector pursuant to the Federal Debt Collection Practices Act ("FDCPA").

67.     Defendants Litton and Ocwen, both obtained servicing rights to collect on Plaintiffs' Note and Mortgage for HSBC Bank after Plaintiffs' were in default and thus are considered debt collectors under the FDCPA.  15 U.S.C. § 1692a(6)(F)(iii). "The term 'debt collector' means any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6).

68.     Federal law prohibits the use of "any false, deceptive, or misleading representation or means in connection with the collection of any debt... including the false representation of... the character, amount, or legal status of any debt... and the threat to take any action that cannot legally be taken..." 15 U.S.C. §1692e(2)(A), (5).

69.     HSBC Bank attempted to collect on the Note under false pretenses, namely that they were assigned Plaintiffs' debt when in fact they were not.

70.     HSBC Bank, Litton, and/or Ocwen, threatened to take action, namely engaging in collection activities that cannot legally be taken by them.

71.     As alleged herein, Plaintiffs' Note was not properly transferred to HSBC Bank, who seeks to cause their purported authorized agent(s), Litton and/or Ocwen to collect mortgage payments and engage in other unlawful collection practices.

72.     On information and belief, HSBC Bank does not have a perfected security interest in Plaintiffs' Note such that they can enforce Plaintiffs' obligation and/or collect mortgage payments.

73.     Plaintiffs allege that HSBC Bank, Litton, and/or Ocwen falsely represented the status of Plaintiffs' debt and HSBC Bank's, Litton's, Ocwen's, and its agents' ability to enforce Plaintiffs' debt obligation, in which they have no pecuniary, equitable, or legal interest.

74.     The conduct described above by HSBC Bank, Litton, and/or Ocwen was malicious because HSBC Bank, Litton, and/or Ocwen knew that they were not acting on behalf of the current pecuniary beneficiary of the Note and Mortgage.  However, despite such knowledge, HSBC Bank, Litton, and/or Ocwen continued to demand and collect Plaintiffs' mortgage payments.

75.     On information and belief, HSBC Bank, Litton, and/or Ocwen engaged and are engaging in a pattern and practice of defrauding Plaintiffs, in that during the entire life of the mortgage Loan, HSBC Bank, Litton, and/or Ocwen failed to properly credit payments made, incorrectly calculated interest on the account, and failed to accurately debit fees.

76.     On information and belief, at all times material, HSBC Bank, Litton, and/or Ocwen had, and have, actual knowledge that Plaintiffs' account was not accurate, but that Plaintiffs would continue to make further payments based on Defendants' inaccurate account.  Plaintiffs made payments based on these improper, inaccurate, and fraudulent representations.

77.     The foregoing acts and omissions of HSBC Bank, Litton, and/or Ocwen constitute numerous and multiple violations of the FDCPA including, but not limited to, each and every one of the above-cited provisions of the FDCPA, 15 U.S.C. § 1692e, with respect to Plaintiffs.

78.     Plaintiffs could not have reasonably known of the existence of a claim for violation of 15 U.S.C. § 1692e because HSBC Bank, Litton, and/or Ocwen fraudulently concealed the fact that they were not entitled to enforce Plaintiffs' debt obligation and that they were falsely representing to Plaintiffs that the character and amount of money Plaintiffs still owed on their debt.[7]

---

[7] "If a reasonable plaintiff would not have known of the existence of a possible claim within the limitations period, then equitable tolling will serve to extend the statute of limitations for filing suit until the plaintiff can gather what information he needs." *Garcia v. Wachovia Mortg. Corp.*, 676 F.Supp.2d 895, 905 (2009) citing *Santa Maria*, 202 F.3d at 1178; see also *Stoll v. Runyon*, 165 F.3d 1238, 1242 (9th Cir.1999) ("Equitable tolling applies when the plaintiff is prevented from asserting a

FIRST AMENDED COMPLAINT                                                                              -18-

79.     As a result of HSBC Bank's, Litton's, and/or Ocwen's violations of the FDCPA, Plaintiffs are entitled to actual damages pursuant to 15 U.S.C. § 1692k(a)(1); statutory damages in an amount up to $1,000.00 pursuant to 15 U.S.C. § 1692k(a)(2)(A); reasonable attorneys' fees and costs pursuant to 15 U.S.C. § 1692k(a)(3); and declaratory relief, from each and every Defendant herein.

80.     Plaintiffs relied on HSBC Bank's, Litton's, and/or Ocwen's misrepresentations and have been damaged in the following ways: (1) multiple parties may seek to enforce their debt obligation against them; (2) the title to their home has been clouded and its salability has been rendered unmarketable, as any buyer of Plaintiffs' home will find themselves in legal limbo, unable to know whether they can safely buy Plaintiffs' home or get title insurance; (3) they have been paying the wrong party for an undetermined amount of time and overpaid in interest that was overcalculated; (4) they are unable to determine whether they sent their monthly mortgage payments to the right party; (5) their credit and credit scores have been damaged; and (6) they have expended significant funds to cover the cost of attorneys' fees and related costs.

## FIFTH CAUSE OF ACTION -VIOLATION OF 15 U.S.C. § 1641(g)

### [Against HSBC Bank and Doe Defendants]

81.     Plaintiffs hereby incorporate by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

82.     Plaintiffs reside in the subject Property and it is their principal residence.

83.     The new subsection (g) added to § 131 of TILA by section 404 of **The Helping Families Save Their Homes Act of 2009** states:

> NOTICE OF NEW CREDITOR-
>      (1)     IN GENERAL. – In addition to other disclosures required by this title, not later than 30 days after the date on which a mortgage

---

claim by wrongful conduct on the part of the defendant, or when extraordinary circumstances beyond the Plaintiff's control made it impossible to file a claim on time.") (citation omitted).

loan is sold or otherwise transferred or assigned to a third party, the creditor that is the new owner or assignee of the debt shall notify the borrower in writing of such transfer, including-

    (A) the identity, address, telephone number of the new creditor

    (B) the date of transfer;

    (C) how to reach an agent or party having authority to act on behalf of the new creditor;

    (D) the location of the place where transfer of ownership of the debt is recorded; and

    (E) any other relevant information regarding the new creditor.

84.    Failure to comply with the requirements of this new subsection 131(g) of TILA may result in civil liability for actual damages, legal fees and statutory damages under section 130(a) of TILA.

85.    "The Helping Families Save Their Home Act of 2009," was expressly created by the legislature to avoid the secretive and purported "assignment" that took place here.  The congressional intent of the Act is clear – it was enacted to assist borrowers in identifying who their purported lender is, so that they could contact them if they needed assistance saving their home.   Here, Plaintiffs did not get that opportunity as they was not notified as mandated by this Act.

86.    Defendant HSBC Bank as the purported assignee of Plaintiffs' debt, as such, Defendant HSBC Bank is liable under TILA's notification guidelines.  Although Plaintiffs dispute the validity of HSBC Bank's claim, for the reasons stated herein, HSBC Bank was still required to follow the provisions of TILA as the purported new creditor.

87.    HSBC Bank purports to be a **creditor** under an alleged "assignment" and is alleged to have violated 15 U.S.C. § 1641(g).

88.    Plaintiffs allege that § 131(g) of TILA applies to HSBC Bank, as the purported and alleged **assignee** of Plaintiffs' Loan.  As the purported assignee of the

Note, HSBC Bank would also be the creditor as they would "***stand in the shoes of the assignor***," i.e. the originating lender who was also the creditor.[8]

89.     Section 131(g) of TILA requires HSBC Bank, as assignee and creditor, to perform and comply with the requirements of the statute or otherwise face statutory and civil penalties and damages.

90.     HSBC Bank did not provide Plaintiffs with written notice within 30 days after the date on which they were allegedly assigned the mortgage.

91.     Mr. Vargas and Mrs. Vargas never received any notice indicating the exact date of the purported assignment of the interest in their Note, as required by § 131(g)(1)(B).

92.     Mr. Vargas and Mrs. Vargas never received any notice indicating how to reach an agent or party having authority to act on HSBC Bank's behalf, as required by § 131(g)(1)(C).

93.     Mr. Vargas and Mrs. Vargas never received any notice indicating the location of the place where transfer of ownership of the debt is recorded, as required by § 131(g)(1)(D).

94.     Mr. Vargas and Mrs. Vargas never received any notice indicating any other relevant information regarding the new creditor, purportedly HSBC Bank, as required by § 131(g)(1)(E).

95.     Plaintiffs could not have reasonably known of the existence of a TILA violation, because Defendants fraudulently concealed the fact that they were purportedly assigned the interest in Plaintiffs' Note and Deed of Trust from Resmae. Even though Litton and/or Ocwen is acting as the servicer of their Note and Deed of Trust, Plaintiffs was not given notice that their creditor had changed to HSBC Bank until September 6, 2011.

---

[8] An assignment operates to transfer to the assignee *all of the rights, title, or interest* of the assignor in the thing assigned. A transfer of all rights, title, and interests *conveys everything* that the assignor owned in the thing assigned and the assignee *stands in the shoes* of the assignor. *Knott v. McDonald's Corp.*, 985 F. Supp. 1222 (N.D. Cal. 1997).

96.    The statute is clear: "Failure to comply with the requirements of this new subsection 131(g) of TILA may result in civil liability for *actual damages, legal fees and statutory damages* under Section 130(a) of TILA." In order to maintain a TILA cause of action Plaintiffs must allege actual damages **and/or** legal fees **and/or** statutory damages.[9]

97.    HSBC Bank violated 15 U.S.C. § 1641 and are subject to statutory damages, civil liability, penalties, attorneys' fees, and actual damages. *See* 15 U.S.C. § 1640. Plaintiffs relied on HSBC Bank's misrepresentations and have been damaged in the following ways: (1) multiple parties may seek to enforce their debt obligation against them; (2) the title to their home has been clouded and its salability has been rendered unmarketable, as any buyer of Plaintiffs' home will find themselves in legal limbo, unable to know whether they can safely buy Plaintiffs' home or get title insurance; (3) they have been paying the wrong party for an undetermined amount of time and overpaid in interest that was overcalculated; (4) they are unable to determine whether they sent their monthly mortgage payments to the right party; (5) their credit and credit scores have been damaged; and (6) they have expended significant funds to cover the cost of attorneys' fees and related costs..

98.    The actual pecuniary damages were proximately caused by HSBC Bank's violation of 15 U.S.C. § 1641 and include, but are not limited to, the overcalculation and overpayment of interest on Plaintiffs' Loan, the costs of repairing Plaintiffs' credit, the reduction and/or elimination of Plaintiffs' credit limits, costs associated with removing

---

[9] *See also, Pacific Shore Funding v. Lozo*, 138 Cal.App.4th 1342, 1350-1351 (2006) (remedies available for violation of 15 U.S.C. § 1640 include damages plus costs of attorney's fees); *King v. Central Bank*, 18 Cal.3d 840, 848 (1997) (reversing trial court's order sustaining demurrer and finding lender liable under 15 U.S.C. § 1640 for "statutory penalties and attorney's fees"); *Chasnik v. BAC Home Loans Servicing LP, et al.* No. CV 11-01324 DMG/JCGx (C.D. Cal, July 20, 2011) (denying motion to dismiss claim for violation of 15 U.S.C. § 1641(g) and finding that "TILA also provides for statutory damages…in an amount not less than $400 or greater than $4,000. 15 U.S.C. § 1640(a)(2)(A)(iv).

FIRST AMENDED COMPLAINT

1   the cloud on their property title, and attorneys' fees and costs, in an amount to be proven
2   at trial.

3       99.    Plaintiffs are entitled to a private right of action to enforce 15 U.S.C. §
4   1641, et seq.

5   **SIXTH CAUSE OF ACTION – VIOLATION OF 12 U.S.C. § 2605 (RESPA)**
6   **[As Against Litton and Doe Defendants]**

7       100.    Plaintiffs hereby incorporate by reference each and every one of the
8   preceding paragraphs as if the same were fully set forth herein.

9       101.    Plaintiffs' Loan is a federally regulated mortgage loan and is subject to the
10  federal Real Estate Settlement Procedures Act and its implementing regulation,
11  Regulation X.

12      102.    On or about March 28, 2011, Plaintiffs sent a Qualified Written Request
13  ("QWR") to Litton, via U.S. Post Certified Mail. *See* **Exhibit "B."**

14      103.    The QWR contained information to enable Litton to identify Plaintiffs'
15  Loan and also contained requests for information of the Loan, specifically the identity
16  and contact information of the creditor of Plaintiffs' Note, a complete loan history,
17  accumulated late fees and charges, and requested information to verify the validity of
18  the purported debt owed to HSBC Bank.

19      104.    Litton did not acknowledge the receipt of Plaintiffs' QWR within 5 day of
20  receipt, as required by section 1463(c) of the Dodd-Frank Act and has yet to further
21  respond at all.

22      105.    Because the Loan is subject to RESPA, the Dodd-Frank Act, and
23  Regulation X, all Defendants were required to comply with section 1463 of the Dodd-
24  Frank Act.

25      106.    Defendants violated Section 6 of Regulation X upon receipt of Plaintiffs'
26  QWR by their actions including, but not limited to: (a) failure to make appropriate
27  corrections in the account of the borrower, including the crediting of any late charges or
28  penalties, and transmitting to the borrower a written notification of the correction; and

(b) failure to protect Plaintiffs' credit rating upon receipt of Plaintiffs' QWR by furnishing adverse information regarding payment to credit reporting agencies as defined in section 603 of the Fair Credit Reporting Act, 15 U.S.C. § 1681(a).

107.   Litton violated 12 U.S.C. § 2605 and is subject to statutory damages, civil liability, penalties, attorneys' fees, and actual damages. *See* 12 U.S.C. § 2605.

108.   The actual pecuniary damages include, but are not limited to, the over calculation and overpayment of interest on Plaintiffs' Loan, the costs of repairing Plaintiffs' credit, the reduction and/or elimination of Plaintiffs' credit limits, costs associated with removing the cloud on their Property title, and attorneys' fees and costs, in an amount to be proven at trial.

109.   As a direct and proximate result of the violations of RESPA, Dodd-Frank Act, and Regulation X by Litton, Plaintiffs have suffered actual pecuniary damages, including but not limited to statutory damages, civil liability, and attorneys' fees, in an amount to be proven at trial.

110.   As a result of Litton's violations of 12 U.S.C. § 2605, RESPA, the Dodd-Frank Act, and Regulation X, Plaintiffs have been damaged in the following ways: (1) multiple parties may seek to enforce their debt obligation against them; (2) the title to their home has been clouded and its salability has been rendered unmarketable, as any buyer of Plaintiffs' home will find themselves in legal limbo, unable to know whether they can safely buy Plaintiffs' home or get title insurance; (3) they have been paying the wrong party for an undetermined amount of time and overpaid in interest that was overcalculated; (4) they are unable to determine whether they sent their monthly mortgage payments to the right party; (5) their credit and credit scores have been damaged; and (6) they have expended significant funds to cover the cost of attorneys' fees and related costs.

///

///

///

## SEVENTH CAUSE OF ACTION –

## VIOLATION OF BUS. AND PROF. CODE SECTION 17200, ET SEQ.

### [Against HSBC Bank, Litton, Ocwen, and Doe Defendants]

111.   Plaintiffs hereby incorporate by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

112.   Defendants have engaged in unfair, unlawful, and fraudulent business practices in the State of California, as set forth above.

113.   By engaging in the above-described acts and practices, Defendants have committed one or more acts of unfair competition within the meaning of Bus. and Prof. Code section 17200, et seq.

114.   Cal. Bus. and Prof. Code section 17200, et seq., prohibits acts of unfair competition, which means and includes any unlawful, unfair or fraudulent business act and conduct which is likely to deceive and is fraudulent in nature.

115.   Defendant HSBC Bank, acting as the trustee of the Nomura Trust, has violated 15 U.S.C. § 1692e, by attempting to collect Plaintiffs' debt obligation under false, deceptive, and misleading representation.

116.   Litton and Ocwen, acting as the mortgage servicer of Plaintiff's Note and Mortgage have violated 15 U.S.C. § 1692e, by attempting to collect Plaintiffs' debt obligation on behalf of HSBC Bank under false, deceptive, and misleading representation

117.   Defendant HSBC Bank has violated 15 U.S.C. § 1641(g), et seq., by: (1) failing to provide Plaintiffs with written notice within 30 days after the date on which they were allegedly assigned the mortgage; (2) failing to provide Plaintiffs notice indicating the exact date of the purported assignment of the interest in their Note; (3) failing to provide Plaintiffs indicating how to reach an agent or party having authority to act on HSBC Bank's behalf; (4) failing to provide Plaintiffs notice indicating the location of the place where transfer of ownership of the debt is recorded; and (5) failing

1  to provide Plaintiffs notice indicating any other relevant information regarding the new

2  creditor, purportedly HSBC Bank.

3      118.   Defendants Litton violated 12 U.S.C. § 2605, by failing to acknowledge the

4  receipt of Plaintiffs' QWR within 5 days of receipt, and by failing to provide a

5  substantive response within 30 days of receipt, as required by section 1463(c) of the

6  Dodd-Frank Act.

7      119.   Defendants HSBC Bank, Litton, and/or Ocwen engaged in unfair,

8  unlawful,[10] and fraudulent business practices with respect to mortgage loan servicing

9  and related matters.

10      120.   Defendants HSBC Bank, Litton, and/or Ocwen failed to disclose the

11  principal for which documents were being executed and recorded in violation of Cal.

12  Civ. Code section 1095.

13      121.   Defendants HSBC Bank, Litton, and/or Ocwen demanded and accepted

14  payments for debts that were non-existent.

15      122.   Defendants HSBC Bank, Litton, and/or Ocwen reported payments as late to

16  credit bureaus without the legal right or authority to do so.

17      123.   Defendants HSBC Bank acted as a beneficiary without the legal authority

18  to do so.

19      124.   Defendants HSBC Bank, Litton, and/or Ocwen facilitated, aided, and

20  abetted the illegal, deceptive, and unlawful enforcement of Plaintiffs' Note and

21  Mortgage and engaged in other illegal debt collection activities.

22      125.   Litton and/or Ocwen, acting as Plaintiffs' mortgage servicer, has been

23  acting in a manner to mislead Mr. Vargas and Mrs. Vargas into believing that HSBC

24  Bank, Litton, and/or Ocwen had the authority to demand payments from them.

25

26

27

28

---

[10] "Unlawful" acts or practices are those forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, or court-made. *Saunders v. Superior Court*, 27 Cal. 4th 832 (1994); *Hewlett v. Squaw Valley*, 54 Cal. 4th 499 (1997).

126.   As alleged herein, Plaintiffs' Note was not properly transferred to HSBC Bank, who seek to cause their purported authorized agent(s) to collect mortgage payments and engage in other unlawful collection practices.

127.   On information and belief, HSBC Bank does not have a perfected security interest in Plaintiffs' Note such that they can enforce Plaintiffs' obligation and/or collect mortgage payments.

128.   Plaintiffs allege, on information and belief, HSBC Bank, Litton, and/or Ocwen fraudulently enforced a debt obligation in which they had no pecuniary, equitable, or legal interest.  HSBC Bank's, Litton's, and/or Ocwen's conduct is part of a fraudulent debt collection scheme.

129.   The conduct described above by HSBC Bank, Litton, and/or Ocwen, was malicious because Defendants knew that they were not acting on behalf of the current pecuniary beneficiary of the Note and Mortgage.  However, despite such knowledge, Defendants continued to demand and collect Plaintiffs' mortgage payments.

130.   On information and belief, at all times material, HSBC Bank, Litton, and/or Ocwen had, and have, actual knowledge that Plaintiffs' account was not accurate, but that Plaintiffs would continue to make further payments based on Defendants' inaccurate account.  Plaintiffs made payments based on these improper, inaccurate, and fraudulent representations.

131.   As more fully described above, Defendants HSBC Bank, Litton, and/or Ocwen's acts and practices are unlawful.  This conduct is ongoing and continues to this date.

132.   As more fully described above, Defendants HSBC Bank, Litton, and/or Ocwen's acts and practices are likely to deceive members of the public.  This conduct is ongoing and continues to this date.

133.   As more fully described above, Defendants HSBC Bank, Litton, and/or Ocwen's acts and practices are unfair and the harm caused by their conduct outweighs

1  any benefit that their conduct may have.  This conduct is ongoing and continues to this

2  date.

3      134.  Plaintiffs allege that by engaging in the above described acts and/or

4  practices as alleged herein, Defendants violated several laws including Cal. Bus. and

5  Prof. Code section 17200, et seq. and must be required to disgorge all profits related to

6  their unfair, unlawful, and deceptive business practices.

7      135.  Plaintiffs allege that Defendants HSBC Bank, Litton, and/or Ocwen's

8  misconduct, as alleged herein, gave them an unfair competitive advantage over their

9  competitors.  The scheme implemented by Defendants HSBC Bank, Litton, and/or

10  Ocwen is designed to defraud California consumers and enrich the HSBC Bank, Litton,

11  and/or Ocwen.

12      136.  The foregoing acts and practices have caused substantial harm to California

13  consumers, including Plaintiffs.

14      137.  By reason of the foregoing, HSBC Bank, Litton, and/or Ocwen have been

15  unjustly enriched, by collecting payments that they are not entitled to, and should be

16  required to make restitution to Plaintiffs and other California consumers who have been

17  harmed, and/or be enjoined from continuing in such practices pursuant to Cal. Bus. and

18  Prof. Code sections 17203 and 17204.

19      138.  As a direct and proximate result of the actions of HSBC Bank, Litton,

20  and/or Ocwen, and each of them, stated above, Plaintiffs have been injured in that a

21  cloud has been placed upon title to Plaintiffs' Property and HSBC Bank, Litton, and/or

22  Ocwen have failed to remove this cloud from Plaintiffs' title.

23      139.  Plaintiffs request the Court to issue an order compelling HSBC Bank,

24  Litton, and/or Ocwen, and any other Defendants claiming an interest in and to the

25  Property to take any and all actions necessary to remove the cloud they have placed

26  upon their title and an order enjoining such Defendants from taking such actions again

27  in the future.

28

140.   As a direct and proximate result of the violations of Cal. Bus. and Prof. Code section 17200 by HSBC Bank, Litton, and/or Ocwen, Plaintiffs have suffered actual pecuniary damages, including, but not limited to civil liability, restitution, injunctive relief preventing HSBC Bank, Litton, and/or Ocwen from continuing to collect mortgage payments, and attorneys' fees, in an amount to be proven at trial.

141.   As a result of HSBC Bank, Litton, and/or Ocwen's violations of Cal. Bus. and Prof. Code section 17200, Plaintiffs have been damaged in the following ways: (1) multiple parties may seek to enforce their debt obligation against them; (2) the title to their home has been clouded and its salability has been rendered unmarketable, as any buyer of Plaintiffs' home will find themselves in legal limbo, unable to know whether they can safely buy Plaintiffs' home or get title insurance; (3) they have been paying the wrong party for an undetermined amount of time and overpaid in interest that was overcalculated; (4) they are unable to determine whether they sent their monthly mortgage payments to the right party; (5) their credit and credit scores have been damaged; and (6) they have expended significant funds to cover the cost of attorneys' fees and related costs.

## EIGHTH CAUSE OF ACTION - ACCOUNTING

### [Against HSBC Bank, Litton, Ocwen, and Doe Defendants]

142.   Plaintiffs hereby incorporate by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

143.   HSBC Bank, Litton, and/or Ocwen as its purported agent, have held themselves out to be Plaintiffs' creditor and mortgage servicer.  As a result of this purported relationship with Plaintiffs, said Defendants have a fiduciary duty to Plaintiffs to properly account for payments made by Plaintiffs. [11]

---

[11] To state a cause of action for accounting, a plaintiff must allege the existence of a fiduciary relationship, or accounts so complicated that an ordinary legal action demanding a fixed sum is impracticable.  5 Witkin, Cal. Proc. 4th (1997) Pleading, section 775, p. 233.  The elements for a claim for accounting are:  (1) fiduciary relationship or other circumstances appropriate to the remedy; and (2) a balance due from the defendant to the plaintiff that can only be ascertained by an accounting.  *See* Witkin, California Procedure, Pleadings, section 776, p. 233 (4th ed.).

144.   As a result of the aforementioned fraudulent conduct, Plaintiffs paid HSBC Bank, Litton, and/or Ocwen their mortgage payments for a period of approximately six years.  However, for the reasons stated herein, none of this money was actually owed to HSBC Bank, Litton, and/or Ocwen.  For that reason, these monies are due to be either credited back to Plaintiffs in full or credited to the rightful owner of Plaintiffs' Note and Mortgage.

145.   The amount of the money due from Defendants to Plaintiffs is unknown to Plaintiffs and cannot be ascertained without an accounting of the receipts and disbursements of the aforementioned transactions.  Plaintiffs are informed and believe and thereon allege that the amount due to them exceeds $75,000.00.

## NINTH CAUSE OF ACTION - QUIET TITLE

### [Against all Defendants and Doe Defendants claiming any interest in the Subject Property]

146.   Plaintiffs hereby incorporate by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

147.   Plaintiffs have offered to tender their obligation and are ready, willing, and able to tender their obligation.

148.   Plaintiffs allege that they are the owner of the subject Property per the Deed of Trust.

149.   The basis for Plaintiffs' interest in title lies in the Deed of Trust from Defendant Resmae, which grants the Subject Property to Plaintiffs, and which is recorded in the Official Records of the County of San Diego.

150.   Plaintiffs are seeking to quiet title against the claims of Defendants as follows: some of the named Defendants are seeking to hold themselves out as the owners of legal title to the Subject Property, when in fact Plaintiffs have an interest in such properties held by Defendants, when Defendants have no right, title, interest, or estate in the Subject Property, and Plaintiffs' interest is adverse to Defendants' claim to ownership.

1    151.   Plaintiffs seek to quiet title as of September 27, 2011.

2    152.   Plaintiffs therefore seek judicial declaration that the title to the subject

3    Property is vested in Plaintiffs alone and that Defendants herein, and each of them, be

4    declared to have no estate, right, title, or interest in the subject Property and that said

5    defendants, and each of them, be forever enjoined from asserting any estate, right, title,

6    or interest in the subject Property, adverse to Plaintiffs' herein.

7                    **TENTH CAUSE OF ACTION - BREACH OF CONTRACT**

8                    **[Against HSBC Bank, Litton, Ocwen, and Doe Defendants]**

9    153.   Plaintiffs hereby incorporate by reference each and every one of the

10   preceding paragraphs as if the same were fully set forth herein.

11   154.   In the alternative, if the Court finds that HSBC Bank is a successor in

12   interest to the Deed of Trust pursuant to the terms of the Deed of Trust, Plaintiffs allege

13   that Defendants HSBC Bank, and Litton and/or Ocwen as their agent, breached the

14   Deed of Trust by improperly crediting and debiting their account.

15   155.   On September 20, 2006, Plaintiffs obtained the subject mortgage loan from

16   Resmae and executed a Note and Deed of Trust.

17   156.   HSBC Bank allegedly became a party to this contract when it was

18   purportedly assigned Resmae's interest in Plaintiffs' Note and Deed of Trust.

19   157.   The Deed of Trust sets forth the dates that the monthly principal and

20   interest payments were due and when late fees and other charges could be assessed.

21   158.   Section 2 of the Deed of Trust states that: "Except as otherwise described in

22   this Section 2, all payments accepted and applied by Lender shall be applied in the

23   following order of priority: (a) interest due under the Note; (b) principal due under the

24   Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic

25   Payment in the order in which it became due." *See* **Exhibit "C,"** attached hereto is a

26   true and correct copy of the Deed of Trust.

27   159.   Plaintiffs substantially performed all of their conditions in the Deed of

28   Trust.

160.   Defendantw HSBC Bank, Litton, and/or Ocwen breached the Deed of Trust by failing to apply the payments made by Plaintiffs in the order of priority set forth in Section 2, and this resulted in improper fees and taxes being added to the balance of the Loan.

161.   Plaintiffs were unaware that Defendants were failing to apply the payments in the way set forth in the Deed of Trust because Defendants fraudulently concealed this practice of applying Plaintiffs' mortgage payments to Plaintiffs' account.  Plaintiffs could not have reasonably discovered the impropriety of Defendants behavior because these facts were hidden from them and were not disclosed throughout the servicing of their Loan.

162.   Plaintiffs could not have reasonably known of the existence of a breach of the Deed of Trust because Defendants fraudulently concealed the improperly applied mortgage payments, the incorrect calculation of interest, and the improper fees added to Plaintiffs' account that did not comply with Section 2 of Plaintiffs' Deed of Trust.

163.   As a proximate result of Defendants' breaches, Plaintiffs have suffered compensatory damages in an amount to be proven at trial.  Plaintiffs relied on HSBC Bank, Litton, and/or Ocwen's misrepresentations and have been damaged in the following ways: (1) multiple parties may seek to enforce their debt obligation against them; (2) the title to their home has been clouded and its salability has been rendered unmarketable, as any buyer of Plaintiffs' home will find themselves in legal limbo, unable to know whether they can safely buy Plaintiffs' home or get title insurance; (3) they have been paying the wrong party for an undetermined amount of time and overpaid in interest that was overcalculated; (4) they are unable to determine whether they sent their monthly mortgage payments to the right party; (5) their credit and credit scores have been damaged; and (6) they have expended significant funds to cover the cost of attorneys' fees and related costs.

///

///

## ELEVENTH CAUSE OF ACTION – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### [Against HSBC Bank, Litton, Ocwen, and Doe Defendants]

164.   Plaintiffs hereby incorporate by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

165.   In the alternative, if the Court finds that HSBC Bank is a successor in interest to the Deed of Trust pursuant to the terms of the Deed of Trust, Plaintiffs allege that Defendants HSBC Bank, Litton, and/or Ocwen breached the implied promise of good faith and fair dealing by making it impossible for Plaintiffs to carry out their obligations under the contract because of the improperly applied payments and addition of interest and improper fees to their account.

166.   In every contract or agreement there is an implied promise of good faith and fair dealing.  Each party agrees to refrain from any action that would render performance of the contract impossible, and to do everything that the contract presupposes that each party will do to accomplish its purpose.[12]  The implied promise of good faith and fair dealing cannot create obligations that are inconsistent with the terms of the contract.[13]  Defendants intentionally misapplied payments to Plaintiffs' account to make it impossible for Plaintiffs to perform their obligations under the Deed of Trust.

167.   As alleged above, Plaintiffs entered into a contract (Deed of Trust) with Resmae and substantially performed the conditions under the Deed of Trust.

---

[12] *April Enters., Inc. v. KTTV*, 147 Cal. App. 3d 805, 816 (1983); *Harm v. Frasher,* 181 Cal. App. 2d 405, 417 (1960).

[13] "There is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." *Comunale v. Traders & General Ins. Co.*, 50 Cal.2d 654, 658  (1958) (internal citation omitted). "The covenant of good faith and fair dealing, implied by law in every contract, exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the *benefits of the agreement actually made*.  The covenant thus cannot " 'be endowed with an existence independent of its contractual underpinnings.' " " It cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement." *Guz v. Bechtel National, Inc.*, 24 Cal.4th 317, 349-350 (2000) (citations omitted).

168. HSBC Bank allegedly became a party to this contract when it was purportedly assigned Resmae's interest in Plaintiffs' Note and Deed of Trust.

169. Defendants enjoyed substantial discretionary power affecting the Plaintiffs' rights under the Deed of Trust as detailed throughout this Complaint. Defendants are required to exercise such power in good faith.

170. Defendants breached their duty of good faith by interfering with Plaintiffs' ability to perform their obligations under the contract because Defendants improperly applied mortgage payments, incorrectly calculated interest, and improperly added fees to Plaintiffs' account making it impossible for Plaintiffs to ever fulfill their obligations. Defendants' failure to cooperate allowed them to collect more money from Plaintiffs than they were owed.[14]

171. Plaintiffs could not have reasonably known of the existence of a breach of the implied covenant of good faith and fair dealing claim because Defendants fraudulently concealed the fact that they were not applying payments in accordance with the Deed of Trust thereby interfering with the Plaintiffs' ability to perform under the contract. Defendants concealed the improperly applied mortgage payments, the incorrect calculation of interest, and the improper fees added to Plaintiffs' account and continued to render Plaintiffs' performance of the contract impossible.

172. As a proximate result of Defendants' breaches, Plaintiffs have suffered general and special damages in an amount to be proven at trial.

173. Plaintiffs relied on HSBC Bank, Litton, and/or Ocwen's misrepresentations and have been damaged in the following ways: (1) multiple parties may seek to enforce their debt obligation against them; (2) the title to their home has been clouded and its salability has been rendered unmarketable, as any buyer of Plaintiffs' home will find themselves in legal limbo, unable to know whether they can safely buy Plaintiffs' home

---

[14] Witkin, Summary of California Law, Contracts, §744 (8th ed.); *see also Sutherland v. Barclays American/Mortgage Corp.*, 53 Cal. App. 4th 299, 314 (1997); *Harm v. Frasher*, 181 Cal. App. 2d 405, 415 (1960).

1  or get title insurance; (3) they have been paying the wrong party for an undetermined

2  amount of time and overpaid in interest that was overcalculated; (4) they are unable to

3  determine whether they sent their monthly mortgage payments to the right party; (5)

4  their credit and credit scores have been damaged; and (6) they have expended significant

5  funds to cover the cost of attorneys' fees and related costs.

6        WHEREFORE, Plaintiffs pray as follows:

7        1.     For compensatory, special, and general damages in an amount according to

8  proof at trial, but not less than $5,000,000.00 against all Defendants;

9        2.     For punitive and exemplary damages in an amount to be determined by the

10  Court against all Defendants;

11        3.     For an order compelling Defendants to remove any instrument, which does

12  or could be construed as constituting a cloud upon Plaintiffs' title to the Property;

13        4.     For a declaratory judgment finding that Defendants do not have any legally

14  cognizable rights as to Plaintiffs, the Property, Plaintiffs' Promissory Note, Plaintiffs'

15  Deed of Trust, or any other matter based on contract or any of the documents prepared

16  by Defendants, tendered to and executed by Plaintiffs;

17        5.     For the Court to issue an order restraining Defendants, their agents, or

18  employees from continuing or initiating any action against the Property and enjoining

19  Defendants, their agents, or employees from doing so during the pendency of this

20  matter;

21        6.     For an order compelling Defendants to disgorge all amounts wrongfully

22  taken from Plaintiffs and returning the same to Plaintiffs' interest thereon at the

23  statutory rate from the date the funds were first received from Plaintiffs;

24        7.     For costs of suit incurred herein;

25  ///

26  ///

27  ///

28  ///

8.   For reasonable attorneys' fees incurred; and

9.   For such other and further relief as the Court may deem proper.

Dated:     November 14, 2011              PROSPER LAW GROUP, LLP


                              By: _____
                                  Gordon F. Dickson
                                  Deborah P. Gutierrez
                                  Michael E. Thompson
                                  Attorneys for Plaintiffs,
                                  Ronal Vargas and Maria Vargas

1

## **DEMAND FOR JURY TRIAL**

2          Plaintiffs Ronal Vargas and Maria Vargas hereby demand a trial by jury on all

3  claims.

4

5  Dated:          November 14, 2011               PROSPER LAW GROUP, LLP

6

7

8                                           By:   _____

9                                                 Gordon F. Dickson
                                                  Deborah P. Gutierrez
10                                                Michael E. Thompson
                                                  Attorneys for Plaintiffs,
11                                                Ronal Vargas and Maria Vargas

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT A**

## Securitization Structure



# EXHIBIT B

# PROSPER LAW CORPORATION
## THE HOMEOWNERS LAW FIRM

March 28, 2011

**Attorneys at Law**
8320 Lincoln Blvd, Suite 164
Los Angeles, CA 90045
Telephone (800) 808-9798
Facsimile (800) 808-0428

**Via Facsimile (713) 218-3777 and Priority Tracking US Mail**

Litton Loan Servicing
4828 Loop Central Drive
Houston, TX 77081

**Gordon F. Dickson, Esq.**
E-Mail: gfdickson@prosperlawcorp.com
Direct Dial: (310) 893-6207

Re:    **QUALIFIED WRITTEN REQUEST**
**Loan Number:** 0041101825
**Our Client:** Ronal Vargas
**Property Address:** 822 Auburn Avenue, Chula Vista, CA 91913

**This letter is a "qualified written request" in compliance with and under the Real Estate Settlement Procedures Act, 12 U.S.C. Section 2605(e).**

To Whom It May Concern:

Please be advised this office has been retained by Ronal Vargas ("Mr. Vargas ") in regards to the accounting and servicing of this loan and the need for understanding and clarification of various sales, transfers, funding sources, legal and beneficial ownership, charges, credits, debits, transactions, reversals, actions, payments, analyses and records related to the servicing of this account from its origination to the present date.  The subject property is located at 822 Auburn Avenue, Chula Vista, CA 91913.

This letter concerns sales and transfers of mortgage servicing rights; deceptive and fraudulent servicing practices to enhance balance sheets; deceptive, abusive, and fraudulent accounting tricks and practices that may have also negatively affected any credit rating, mortgage account and/or the debt or payments that my clients may be legally obligated to.

Please provide the following information:

1. A complete life of loan transactional history;
2. The Transaction Codes for the software platform of the Servicer;
3. The Code definitions in plain English;
4. The Key Loan Transaction history, bankruptcy work sheet (if any), or any summary of all of the accounts in an XL spreadsheet format;
5. The MERS Milestone Reports and the Edgar website address for the Pooling and Servicing Agreement, Prospectus and Prospectus Supplement;
6. The name, address, name of a contact person and telephone number of the current holder in due course and owner of the mortgage note;
7. Copies of all collection notes and communications files;
8. An itemized statement of the amount needed to fully reinstate the loan;
9. All communications with any non-lawyer third-party providers; and
10. All Form P-309 screen shots of all system accounts (principal, interest, escrow, late charges, legal fees, property inspection fees, property preservation fees, broker price opinion fees, statutory expense fees, miscellaneous fees, corporate advance fees, trustee suspense accounts, debtor suspense accounts) associated with the loan.

# EXHIBIT C

**RECORDING REQUESTED BY:**
**NEW CENTURY TITLE COMPANY**
~~Recording Requested By:~~
RESMAE MORTGAGE CORPORATION

Return To:

RESMAE MORTGAGE CORPORATION
6 Pointe Drive
Brea, CALIFORNIA 92821
Attn. Final Documents

Prepared By:
Gina  Romero  6 Pointe
Drive, Brea, CALIFORNIA
92821

1002157

DOC #    2006-0684947

SEP 26, 2006        3:55 PM
OFFICIAL RECORDS
SAN DIEGO COUNTY RECORDER'S OFFICE
GREGORY J. SMITH, COUNTY RECORDER
FEES:            91.00
PAGES:           25            DA:        1

**2006-0684947**

————————————[Space Above This Line For Recording Data]————————————

# DEED OF TRUST

MIN 100335010022277019

## 15359

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated **September 20, 2006**
together with all Riders to this document.
(B) "Borrower" is **RONAL VARGAS AND MARIA ELENA VARGAS, HUSBAND AND WIFE AS
JOINT TENANTS**

Borrower is the trustor under this Security Instrument.
(C) "Lender" is **RESMAE MORTGAGE CORPORATION**

Lender is a **Corporation**
organized and existing under the laws of **DELAWARE**

1002227701

**CALIFORNIA**-Single Family-**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS**                    Form 3005  1/01

VMP®-6A(CA) (0005).01
Page 1 of 15                    Initials: R.V  JR
            VMP MORTGAGE FORMS - (800)521-7291    M.EV

**15360**

Lender's address is 6 POINTE DRIVE BREA, CALIFORNIA 92821

(D) "Trustee" is NEW CENTURY TITLE COMPANY

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) "Note" means the promissory note signed by Borrower and dated September 20, 2006
The Note states that Borrower owes Lender Four Hundred Eighty Thousand and 00/100
                                                                            Dollars
(U.S. $      480,000.00    ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than October 01, 2036

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| [x] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [x] Balloon Rider | [x] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

1002227701

-6A(CA) (0005).01                    Page 2 of 15        Initials: R I U  B R           Form 3005   1/01
                                                                 M · E L

15361

(Q) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

**TRANSFER OF RIGHTS IN THE PROPERTY**

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County of SAN DIEGO :

[Type of Recording Jurisdiction]          [Name of Recording Jurisdiction]

**Attached hereto and made a part hereof as "Exhibit A."**

Parcel ID Number: 642-200-28                                        which currently has the address of
822 AUBURN AVENUE                                                      [Street]
CHULA VISTA                          [City], California 91913       [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances

1002227701

-6A(CA) (0005).01                    Page 3 of 15           Initials: R, V SR      Form 3005   1/01
                                                                    M. E. V

*15362*

of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

1002227701

-6A(CA) (0005).01                    Page 4 of 15          Initials: *R. V. 5R*   Form 3005   1/01
                                                                   *M. E. V*

**15363**

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

1002227701

-6A(CA) (0005).01                          Page 5 of 15                 Initials: R.V. SR
                                                                        M.E.L               Form 3005   1/01

*15364*

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

1002227701

-6A(CA) (0005).01                          Page 6 of 15                 Initials: Q.V ᴶᴿ  Form 3005  1/01
                                                                          M.C. V

*15365*

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

1002227701

-6A(CA) (0005).01          Page 7 of 15          Initials:          Form 3005   1/01

*15366*

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

1002227701

Ⓥ -6A(CA) (0005).01                   Page 8 of 15         Initials: R.V   S.R.
                                                                    M.E.             Form 3005   1/01

*15367*

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

1002227701

*-6A(CA)* (0005).01      Page 9 of 15      Initials: R. V.   M. E.      Form 3005 1/01

Printed on:2/16/2011 2:18 PM

15368

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

1002227701

-6A(CA) (0005).01                    Page 10 of 15          Initials: R. V   SR        Form 3005   1/01
                                                            M. E. V

*15369*

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

1002227701

-6A(CA) (0005).01          Page 11 of 15          Initials: R. V.   S.R   Form 3005   1/01
                                                            M. E. V

*15370*

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

1002227701

-6A(CA) (0005).01                     Page 12 of 15            Initials: R . V                     Form 3005   1/01
                                                                       S R
                                                               M . E . V .

*15371*

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. Statement of Obligation Fee. Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

1002227701

-6A(CA) (0005).01                     Page 13 of 15          Initials: *R . V*   *SR*          Form 3005  1/01

*M . E . V*

*15372*

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_Ronal Vargas S.R_ (Seal)
RONAL VARGAS                    -Borrower

_____

_Maria Elena Vargas_ (Seal)
MARIA ELENA VARGAS              -Borrower

_____ (Seal)          _____ (Seal)
              -Borrower                          -Borrower

_____ (Seal)          _____ (Seal)
              -Borrower                          -Borrower

_____ (Seal)          _____ (Seal)
              -Borrower                          -Borrower

1002227701

-6A(CA) (0005).01              Page 14 of 15              Form 3005  1/01

*15373*

State of California
County of   SAN DIEGO                                    } ss.

On        9/20/06        before me,   Karina Macias (notary public)
                                                        personally appeared

RONAL VARGAS, MARIA ELENA VARGAS

, personally known to me
(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed
to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity
upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_Karina Macias_ (Seal)



1002227701

MADP -6A(CA) (0005).01                    Page 15 of 15        Initials: R.V  SR          Form 3005   1/01
                                                                        M.E.V

# EXHIBIT "A"

*15374*

Lot 255 of Southwestern College Estates Unit no. 3, in the City of Chula Vista, County of San Diego, State of California, according to map thereof no. 6247, filed in the Office of the County Recorder of San Diego County, December 10, 1968.

Excepting therefrom all the minerals, coals, oils, petroleum, gas and kindred substances under and in said land, but without right of entry of the surface thereof, but with the right however to drill in, through or under said land or to explore, develop and take all minerals, coals, oils, petroleum, gas and other kindred substances in and from said land, all such operations to be conducted below a depth of 500.00 feet below the surface thereof.

Also excepting therefrom adjacent dedicated streets.

## PROOF OF SERVICE

### <u>Vargas v. Bridgefield Mortgage Corporation, et al.</u>
### <u>United States Central District Court of California Case No. CV11-8002-CBM</u>
### <u>(JCGx)</u>

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is Prosper Law Group, LLP, 6100 Center Drive, Suite 1050, Los Angeles, CA 90045. On November 14, 2011, I served the following document(s) by the method indicated below:

### FIRST AMENDED COMPLAINT

[ ]   BY CM/ECF ELECTRONIC DELIVERY: In accordance with the registered case participants and in accordance with the procedures set forth at the United States District Court, Central District of California website www.ecf.cacd.uscourts.gov.

[X]   by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California addressed as set forth below. I am readily familiar with the firm's practice of collection and processing of correspondence for mailing. I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date on postage meter date is more than one day after the date of deposit in this Declaration.

[ ]   by placing the documents(s) listed above in sealed envelope(s) and by causing personal delivery of the envelope(s) to the person(s) at the address(es) set forth below. A signed proof of service by the process server or delivery service will be filed shortly.

[ ]   by placing the document(s) listed above in a sealed envelope(s) and consigning it to an express mail service for guaranteed delivery on the next business day following the date of consignment to the address(es) set forth below. A copy of the consignment slip is attached to this proof of service.

### See Attached Service List

I declare under penalty of perjury under the laws of the United States that the above is true and correct.

Executed on November 14, 2011, at Los Angeles, California.

Shawnee A. Ellington

**Service List**

Vargas v. Bridgefield Mortgage Corporation, et al.
United States Central District Court of California Case No. CV11-8002-CBM
(JCGx)

<u>Authorized Agent for Defendant Bridgefield Mortgage Corporation f/k/a Resmae Mortgage Corporation</u>
<u>Maria Sanchez</u>
CT Corporation System
818 W. Seventh Street
Los Angeles, CA 90017

<u>Attorneys for Defendants HSBC BANK USA, NATIONAL ASSOCIATION AS TRUSTEE UNDER NOMURA HOME EQUITY, INC. ASSET-BACKED CERTIFICATES, SERIES 2007 and LITTON LOAN SERVICING</u>

Eric D. Houser, Esq.
Carrie N. Heieck, Esq.
Houser & Allison
A Professional Corporation
701 Palomar Airport Road, Suite 200
Carlsbad, CA 92011

Deborah P. Gutierrez, Esq. SBN 240383
Prosper Law Group, LLP
6100 Center Drive, Suite 1050
Los Angeles, CA 90045
T: (310) 893-6200  F: (310) 988-2930
Deborah@prosperlaw.com

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | CASE NUMBER |
|---|---|
| RONAL VARGAS, an individual, and MARIA VARGAS, an individual, <br> PLAINTIFF(S) <br> v. <br> BRIDGEFIELD MORTGAGE CORPORATION F/K/A RESMAE MORTGAGE CORPORATION (See Attachment to Summons for Additional Parties.) <br> DEFENDANT(S). | CV11-08002 RSWL (JCGx) <br><br> FIRST AMENDED **SUMMONS** |

TO:   DEFENDANT(S): _____

_____

A lawsuit has been filed against you.

Within ___21___ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, Deborah P. Gutierrez, Esq. , whose address is Prosper Law Group, LLP, 6100 Center Drive Suite 1050, Los Angeles, CA 90045 . If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: 11/14/11 _____          By: _____
                                                        Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

| | |
|---|---|
| 1 | Name: Deborah P. Gutierrez Esq. SBN 240383 |
| 2 | Address: Prosper Law Group, LLP |
| 3 | 6100 Center Drive, Suite 1050, Los Angeles CA, 90045 |
| 4 | Phone: (310) 893-6200 |
| 5 | Fax: (310) 988-2930 |
| 6 | In Pro Per |

7

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| 9 | | CASE NUMBER: |
| 10 | RONAL VARGAS and MARIA VARGAS | |
| 11 | Plaintiff | CV11-08002 RSWL (JCGx) |
| 12 | v. | |
| 13 | BRIDGEFIELD MORTGAGE CORPORATION F/K/A | **FIRST AMENDED** |
| 14 | RESMAE MORTGAGE CORPORATION, ET AL. | **ATTACHMENT TO SUMMONS** |
| 15 | Defendant(s). | |

16 Additional Defendants:

17 HSBC BANK USA, NATIONAL ASSOCIATION AS TRUSTEE UNDER NOMURA HOME

18 EQUITY, INC. ASSET-BACKED CERTIFICATES, SERIES 2007-3; LITTON LOAN SERVICING,

19 LP; OCWEN LOAN SERVICNG, LLC; and Does 1 – 10, inclusive,

20

21

22

23

24

25

26

27

28

# PROOF OF SERVICE

## Vargas v. Bridgefield Mortgage Corporation, et al.
## United States Central District Court of California Case No. CV11-8002-CBM (JCGx)

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is Prosper Law Group, LLP, 6100 Center Drive, Suite 1050, Los Angeles, CA 90045. On November 14, 2011, I served the following document(s) by the method indicated below:

## FIRST AMENDED SUMMONS

[ ] BY CM/ECF ELECTRONIC DELIVERY: In accordance with the registered case participants and in accordance with the procedures set forth at the United States District Court, Central District of California website www.ecf.cacd.uscourts.gov.

[X] by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California addressed as set forth below. I am readily familiar with the firm's practice of collection and processing of correspondence for mailing. I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date on postage meter date is more than one day after the date of deposit in this Declaration.

[ ] by placing the documents(s) listed above in sealed envelope(s) and by causing personal delivery of the envelope(s) to the person(s) at the address(es) set forth below. A signed proof of service by the process server or delivery service will be filed shortly.

[ ] by placing the document(s) listed above in a sealed envelope(s) and consigning it to an express mail service for guaranteed delivery on the next business day following the date of consignment to the address(es) set forth below. A copy of the consignment slip is attached to this proof of service.

## See Attached Service List

I declare under penalty of perjury under the laws of the United States that the above is true and correct.

Executed on November 14, 2011, at Los Angeles, California.

Brittany Auchard

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### Service List

Vargas v. Bridgefield Mortgage Corporation, et al.
United States Central District Court of California Case No. CV11-8002-CBM (JCGx)

Authorized Agent for Defendant Bridgefield Mortgage Corporation f/k/a Resmae Mortgage Corporation
Maria Sanchez
CT Corporation System
818 W. Seventh Street
Los Angeles, CA 90017

Attorneys for Defendants HSBC BANK USA, NATIONAL ASSOCIATION AS TRUSTEE UNDER NOMURA HOME EQUITY, INC. ASSET-BACKED CERTIFICATES, SERIES 2007 and LITTON LOAN SERVICING

Eric D. Houser, Esq.
Carrie N. Heieck, Esq.
Houser & Allison
A Professional Corporation
701 Palomar Airport Road, Suite 200
Carlsbad, CA 92011

Authorized Agent for Defendant OCWEN LOAN SERVICNG, LLC

Corporation Service Company
2711 Centerville Road, Suite 400
Wilmington, DE 19808